ARBUCKLE-RYAN CO. *v.* CITY OF GRAND LEDGE.

122    491
152    682

MUNICIPAL CORPORATIONS—CONTRACTS—ULTRA VIRES—LIMIT OF TAXATION—BURDEN OF PROOF.

> After the common council of a city had voted the entire amount of taxes which, under the charter, it might lawfully vote in a given year, it entered into a contract for the installation of an engine in the city electric-lighting plant, by the terms of which the city agreed to pay $2,650 within 30 days after the engine should be accepted. After the engine had been accepted, and $650 paid on the contract, the city refused to pay the balance, claiming that the contract was *ultra vires,* because in excess of the amount of indebtedness which the council was authorized to incur. The tax levy for the year included an item of $1,400 for electric-lighting purposes. *Held,* that, in order to maintain the defense, it was incumbent upon the city to show that, at the date of the contract, there were not sufficient funds on hand, either in the lighting fund or the general fund, or both, which, added to the $1,400 to be raised, would have enabled the city to meet the obligations imposed by the contract GRANT, C. J., dissenting.

Error to Eaton; Smith, J. Submitted April 5, 1899. Decided December 30, 1899.

*Assumpsit* by the Arbuckle-Ryan Company against the city of Grand Ledge for goods sold and delivered.

From a judgment for plaintiff, defendant brings error. Affirmed.

The city of Grand Ledge, through its proper officers, on the 23d day of June, 1896, in pursuance of a resolution unanimously adopted by the common council on the same day, entered into a contract with the Chase Construction Company, of Detroit, Mich., by the terms of which contract the construction company, in consideration of the sum of $2,650 and certain used machinery, agreed to furnish one Russell engine, the same to be paid for within 30 days after it had been set, and tested and approved by the city electrician. The engine was furnished, was worth the contract price, and was accepted by the common council November 17, 1896. The city has paid on the contract $650 in cash and the specified used machinery. After the engine had been accepted, further time for payment was asked and granted. The city thereupon gave an order to the company, said order being for the sum of $2,000, with interest, and payable out of the electric fund. The construction company, December 16, 1896, assigned its interest in the contract and order to plaintiff, the Arbuckle-Ryan Company. The balance of the purchase money has not been paid, and was past due at the time suit was commenced. Defendant has the engine, has used it since acceptance, and has not tendered performance by payment, nor offered to return the engine. When the contract was made, the city had installed and was operating an electric-lighting plant, by means of which it lighted the streets and furnished lights to the inhabitants. It was necessary to secure a new engine for the further safe operation of this plant, and for more power.

By the charter of the city of Grand Ledge, the common council is limited to a tax of not to exceed 1 per cent. on the assessed value of all the real and personal property in the city made taxable by law. The city taxes of Grand Ledge are spread upon a roll which goes to the collector in July of each year. The estimates must be made in May, and

must be adopted by the common council at the first regular June meeting in each year. Before the contract in question was made, the taxes for 1896 had been voted and assessed at the sum of $7,800 for the following purposes:

| | |
|---|---:|
| For outstanding indebtedness | $5,000 |
| " interest on same | 500 |
| " electric-lighting purposes | 1,400 |
| " officers' salaries | 400 |
| " bridge fund | 500 |

At the time the contract was made, the floating indebtedness was about $4,000, $3,000 of which was not due until May, 1897. The assessed valuation for Grand Ledge in 1895 was $755,774; for 1896, $772,065; for 1897, $742,500. The amount of taxes levied in 1895 was $3,000; in 1896, $7,800; and in 1897, $7,533. The amount yearly expended, including the interest account on the bonded and floating indebtedness, and not taking into account the expense or income of the water and electric-lighting plants, would be not far from $3,000 for each of the years 1895, 1896, and 1897. When the order in suit was issued, December 15, 1896, the floating indebtedness had increased from about $4,000 in the June preceding to about $7,000, and no part of the $4,000 had been paid out of the estimates made for taxation for the year 1896. At the time of the estimate in June, 1897, the city owed about $7,000 floating indebtedness, of which $3,000 did not become due until June 1, 1900, and $2,000 until October 20, 1898.

This suit was brought to recover on the above order. Judgment for plaintiff for $2,158.30 and costs.

*Cassius Alexander* (*S. L. Kilbourne,* of counsel), for appellant.

*Clarke & Latting* (*Russell C. Ostrander,* of counsel), for appellee.

GRANT, C. J. (*after stating the facts; dissenting*).

The contract which is the real basis of this suit is attacked as void because not within the power of the council to make. Counsel do not disagree as to the law. The following propositions are so well settled that the citation of authorities is unnecessary:

1. The agents of municipal corporations are limited to the power expressly conferred or necessarily implied.

2. Parties dealing with municipal corporations through their agents are conclusively presumed to know the law, and deal with them at their own risk.

3. When the charters of municipal corporations limit their agents to a certain rate of taxation, contracts in excess of that rate are void.

The question therefore becomes substantially one of fact, viz.: Did the estimates adopted by the common council prior to the making of this contract include it, or was there any money voted which could properly be used for that purpose? There is nothing on the record to show that at the time these estimates were made in May, and adopted in June, the purchase of this engine had even been suggested or contemplated. The amounts then adopted were up to the limit of taxation. The purposes for which the amounts were raised were well defined. The sole amount raised for electric-lighting purposes was $1,400. All the rest was for outstanding indebtedness, interest on same, salaries, and bridge fund. Clearly, this amount was not included in the estimates, and no taxpayer or member of the council had anything before him to inform him that any such action was then contemplated. I think it impossible to reasonably reach any other conclusion than that the amount provided by this contract was in excess of the limit imposed by the charter for taxation. The result showed that this was so, because, when the contract was completed, there were no funds with which to pay, and an order was given, payable out of the electric fund. The common council had no power to take funds voted for one purpose and apply them to another. The charter provided the proper method for the council to

pursue, viz., to borrow the money for the purchase of the engine and boiler, provided the electors should authorize it.  Act No. 322, Local Acts 1893, chap. 22, § 13.  If plaintiff's assignor, at the time of entering into the contract, had taken the trouble to examine the records of the common council, it would have discovered the facts above set forth, and that there was no money on hand, and no provision for raising any funds, to meet this extraordinary expenditure.  The action cannot be defended upon the ground that it was necessary for the safety of the workmen, or to supply the city with light.  Common councils are not vested with authority to determine the necessity of expenditures which are beyond their power to incur.  If they desire to exceed the limit, they must appeal to the electors under the charter.

This is not a case for the application of the doctrine of estoppel, in support of which counsel for plaintiff cite *Nelson* v. *Mayor, etc., of New York*, 63 N. Y. 535.  In that case the materials furnished exceeded the limitation, and the court expressly held that contracts in excess thereof were void, but permitted a recovery upon the ground of a subsequent act of the legislature authorizing the transaction.  Nor is it within the principle enunciated in *Coit* v. *City of Grand Rapids*, 115 Mich. 493, where it was held that "mere irregularities of action, not going to the essentials of the power, are not sufficient to defeat the exercise of the power."  There was, in the present case, an absolute want of authority to enter into the contract, because the limitation of taxation had been reached. *Trump Manfg. Co.* v. *Village of Buchanan*, 116 Mich. 113.

The language of Justice Swayne, in *Railway Co.* v. *McCarthy*, 96 U. S. 267, that "the doctrine of *ultra vires*, when invoked for or against a corporation, should not be allowed to prevail where it would defeat the ends of justice," was not applied to municipal corporations, but to private corporations.  The defendant railway company had agreed with the plaintiff in that suit to transport

cattle from East St. Louis to Philadelphia over other lines than its own, and the defense was that the contract was *ultra vires*. It is not surprising that that language was used, so entirely applicable to the defense in that case. But does it apply to a municipal corporation, which can exercise only the powers expressly or by necessary implication conferred upon it?

Are these limitations, placed by the people for their protection upon the powers of a municipal corporation, to be abrogated on the ground that the corporation has had the benefit of the contract, and therefore the people are estopped to assert its invalidity? Probably a large proportion of *ultra vires* contracts on the part of municipal corporations could be sustained if this rule were adopted. In the case of *Coit* v. *City of Grand Rapids, supra*, we said: "If we conceded the premises assumed by defendant, viz., that the contract was wholly *ultra vires*, we might be compelled to reach the conclusion that the city could not be estopped to set up its invalidity." The contract in that case was within the power of a municipality to make. Its action was merely irregular, and it is not necessary here to comment further upon it. When a certain limit of taxation is reached, the charter absolutely prohibits the making of contracts or incurring obligations beyond that limitation, and every such contract is wholly *ultra vires*. By no other holding can this wise provision of the law be given any effect. If the common council in this case could have made a contract for $3,500, it could just as well have made one for $35,000. The law absolutely enjoins the power when the limit is reached.

In *Wilkins* v. *Mayor, etc., of New York*, (Com. Pl.) 30 N. Y. Supp. 424, the city entered into a contract with the Staten Island Rapid-Transit Company under a lease of a certain ferry, by which the company agreed to make extensive and valuable improvements of a permanent character upon the wharf. These improvements had been authorized by a board of commissioners. The improvements were made. By the terms of the agreement, the

company was, upon certain conditions, to be reimbursed for these permanent improvements. It will be observed in that case that the improvements had been authorized by the proper municipal authorities, but the city had no authority to get the improvements made as was done under the terms of the lease with the ferry company. Strictly speaking, therefore, the contract was *ultra vires,* but the very thing to be done had been authorized. It was the method of doing, not the act, that was *ultra vires.* Many cases similar to this can be found, where the courts have applied the doctrine of estoppel to those contracts which are technically *ultra vires,* but which have been carried out, and of which the municipality has received full benefit. But do such cases apply to contracts and indebtedness incurred in direct violation of the charter of a municipality? It would be a dangerous doctrine to establish that a municipal common council could enter into contracts with those who are always anxious to sell their goods, and then estop the municipality from contesting the validity of the contract, on the ground that it has had the benefit of it. To say that the contract was within the apparent power of the council is not, in my judgment, correct. Have parties dealing with a municipal corporation the right to rely upon an apparent power in its agent, the common council, whose power is limited by the charter? What is an apparent power? Is it such as may be implied from a general agency? But do municipalities have general agents, who are presumed to be acting within the scope of their authority? Certainly not. It must follow that there is no apparent power upon which one may rely, but only the real, actual power, lodged in the municipality by the charter. Its charter is the sole guide, which all are held to know. To that alone parties must look and act at their peril. If the council refuses to tender back the property under such an illegal contract, the law provides a way for the party to regain possession of it. If he suffers some loss in so doing, he cannot complain,

because he should have made an examination into the authority of the council.

After writing the above, two rearguments were ordered on the following questions:

1. Was the amount of the order included in the tax budget of 1897?
2. If so, was this a valid ratification of the contract?
3. Does the record show that there was no money in the treasury when the contract was made which might have been appropriated in payment thereof?

The case was tried upon the theory that there was no money in the treasury out of which it could have been paid, and upon that theory was argued in this court. Counsel for plaintiff do not now contend that there was. There is nothing in the record to indicate that the amount was included in the budget of 1897. We need not, therefore, discuss the question of ratification. The burden of proof was upon plaintiff, and it has failed upon both of the above questions of fact.

Judgment should be reversed, and new trial ordered.

MONTGOMERY, J. I am for affirmance. The contract between the city and the Chase Construction Company was within the general powers of the common council. It was not, in its nature, *ultra vires*. If the condition of the city finances was such that the obligation arising out of the contract would exceed the amount which the common council was authorized to incur an obligation to expend, it was incumbent on the defendant to make that fact affirmatively to appear. It does not appear in the findings. It does not appear in the testimony. On the contrary, it does appear that $1,400 was provided in the budget for the electric-lighting fund. This sum, it is true, was less than the sum required, but there is nothing to show that there were not sufficient funds on hand, either in the lighting or general fund, or both, to supplement this $1,400, and meet the obligation. It does not appear that, if the Chase Construction Company had

investigated the condition of the treasury, it would have found no money on hand. The record is silent on this point. True, at a later date, when an order was issued, the electric-light fund had been depleted until it showed but $362.54; but I discover no *data* in the record from which the condition of this fund on the 23d of June, 1896, can be determined. We should indulge in no pre-sumptions of official wrong-doing in favor of a defense so unconscionable as that attempted in this case.

HOOKER and MOORE, JJ., concurred with MONT-GOMERY, J. LONG, J., took no part in the decision.